I bring your honors of the police and court, Robert Scott on behalf of the estate of Jane Fong. I'd like to reserve five minutes for rebuttal if I could. I've argued a lot of these cases on the rescission issue, on knowledge, misrepresentation. I've always been guided by the fundamental finding of our Supreme Court in Thompson v. Occidental. But I'd like to start our argument here in just one sentence of a case that I did cite to the court, which precedes Thompson and is also a California Supreme Court decision decided on Bonk, 1967. Interestingly, I cited two cases to you that our Supreme Court decided on the same day, in 1967, in life insurance cases. And this one is the Metropolitan Life v. DeVore. And in that case, at the official site at 345, court citing other cases and focusing on the fact that this was an insurance application that then had a medical exam that followed exactly the case here, that in that regard, the court concluded, citing to another case, that it would be unfair to hold the policy void where it ensured had complied with every provision of the contract, merely because lurking undetected within his anatomy was some pathology that would, in the future, prove fatal. That is exactly the case that we have in front of us today. Well, you have a condition in the policy here that says if there's been a consultation with a doctor at a, you know, after issuance but before delivery, then the policy may not be effective. If I could, Your Honor, in all deference, it is not in the policy. That language is not in the policy at all. It is in the application. Let me help you. It's in the application. It's a 20-page application. That's Part A. Part B, because this is a variable annuity and it has a bunch of moving parts in the application, it also has the relevant questions of health, and that is deferred to Part B because there's an actual physician exam. And it also has all of the different things of hazardous activity and all those other statements that one would make about one's person to gain insurance because the companies are assessing risk. That question that you focus on, that sentence, which is the one I, too, want to focus on, on page 94 of our Volume 1, it's part of that 20-page application, that's what the page looks like. And, yes, it is signed on the date she filled it out, December 26, 2000. That's the page. All that language. The point you make here, it's 94. That is not bolded, as you can see some is. It's not bolded. It's not brought to anyone's attention. And you are suggesting, and I think correctly so, Your Honor, that it operates as an exclusion to the policy. It is not an exclusion found in the policy. It's not an exclusion found under the exclusion section or anywhere in the language of the policy, not even a word. And let us focus on it because it really is the crux of the case. It's a fascinating question. And if I could, just as a predicate to it, normally in insurance, we take an application and we come back sometime after underwriting and we deliver the policy. Now, there could be temporary insurance if premium is paid. We don't have that case, so let's forget that one. Those are all other cases. Here, there's no money paid. So the only time we're going to have a deal is when I come back to you as the agent and deliver the policy and say, Sir, here's your policy. And you say, Sir, here's your check. We have a deal. The company could have asked, and I suggest to you the industry practice as decided in some of the cases, including the one I've decided to do. The company could have asked one question. How are you today? Have you seen any doctors? They could have asked the question. It's called the good health of the insured on date of delivery. That's how we call it in insurance parlance, in the insurance horn books and in our case law. They could have asked just that one question. Frankly, they could have asked, and many do, would you reaffirm all of the things that you said at that application, in this case, 59 days before? All of those things. Have you done any scuba diving? Have you taken up skydiving? Those kinds of things. But mostly we focus on health questions. They could have asked, would you please reaffirm to us at the time of signing that your health is the same as it was at the time, 59 days before, when you signed it actually 57 days because the health exam, this app was signed, as you can see on the 20s. To me, Mr. Scott, as if it's a little different from this D2 that says only. That's it. If at the time of the delivery and payment, each person proposed for insurance in A and B. Is living. Is living and has not consulted or been examined or treated by a physician since the latest Part B participating to that person was completed. But Your Honor, this document, as you can see by its terms on the bottom, is signed on December 26th. Right. We're talking about delivery that occurs on the last day of February 27th of the next year. Yeah. 59 days later. If it doesn't say anything in here about, but if it takes more than 30 days, this doesn't count. That's not my point. My point is all the company had to do. There's no mistake. She makes no misrepresentation. There's no question asked of her. There's no misrepresentation. It's what we're doing is we've tried this policy twice. This application, not the policy. This application, that one part sentence that is not brought out or highlighted, that is not within our reasonable expectation of coverage when we buy insurance. As a matter of, I think, reason and law. That one sentence shifts the burden to you, the insured, to remember from the time you filled out the application that you had, for example. Let's take a common one. Seeing a doctor for a mammography. These are. We'll see. Gone to a health urgent care center because you stepped on a nail playing with your kid outside. Those would be enough to void the policy where we know in California law, the case I cited, and most importantly, the fundamental case of Thompson versus Oxnell, our Supreme Court, the case that's the seminal case in this field. The company has to ask questions. They are deemed relevant and material if they are asked. And the person has to misstate that as a basis for the company to get out of its obligation. The question here is, does this provide enough notice to an insured to shift that burden and make the insured then tell you, me, the agent. Yes. Months later, oh, I've seen a doctor. Let me suggest to you, Your Honor. And I've really done it in a couple of different sentences here, but let me just say it another way. If it operates as an exclusion to exclude us from coverage, which it obviously is their intent to. It has to, under the cases I've suggested to you, be clear, plain and conspicuous. It is none of those things. It has to be in a place in the policy that exclusions are found. It is not. The policy does not have this as an exclusion. It is not listed. Not one word like this. It's there. The only place this is, is in a long page, one of 17, that are the application. That's all. That is not enough. And I would cite to you, I did, the Ponder case. But I would also cite the most recent case of our Supreme Court. I thought of it sitting here today. Forgive me for not bringing it forward sooner. Haines v. Allstate, which is our California Supreme Court case, within the last, oh, within the last six months, that said, no, you have to put exclusions. It's the reasonable expectation of the insured. And when we look at that, what do we really find? Well, at least we're going to find it, and when you look in the exclusion section, that's where it should be. Because if you're not going to find the exclusions there, where the heck is it going to be in the policy anyway? That's exactly this case. What we have done is we have flipped, number one, the policy, and we have flipped, number two, the burden onto the proposed insured to reaffirm voluntarily, voluntarily, or risk total forfeiture when the insured event has already occurred, and it's no longer within the control of the insured to remedy the circumstance. What obligation did Ms. Fong have to disclose her medical condition, specifically changes to it? Well, if you recall, at the time, well, first let me answer the question. She did not have any obligation other than those that would have been imposed upon her in a reasonable, proper, legal way within this contract formation setting. She had none. There is no common law duty at all. And defense has suggested that there is a good faith duty here. There's no good faith duty on either side of this case at the time of contract formation. Both sides are strangers. It only occurs when the policy is delivered, the check is exchanged, and there's a deal. Because before that, they are still strangers. Both have the ability to walk away from the deal. Here, in insurance, recall that we are in the area of insurance. We are not in a commercial transaction. Our Supreme Court and our decisions in our law have said that these are very protected areas of law, because we have to protect those that can write policies and have a huge staff of lawyers and insurance folks that can craft policies in certain ways. We have to protect our public from those practices. Not that they're predatory, and I don't suggest they are here. But we have to suggest that we have to protect them from language like this that sort of just sneaks in. Let's assume this condition precedent, if it is that, is not part of this case. And this whole case is whether there was a change in our medical condition, which was not the insured that the insurance company agreed to provide coverage for. Where are we? First of all, I understand your point. Let me just give you one predicate and I'll answer it directly. Sure. These cases all look at a window of time. Everyone. It's just the way insurance is bought and sold. We start the deal. There's underwriting. There's a deal. It's only the window of time. There is no case in California, and there is no case in Appleman or the other treatises that suggest a majority of jurisdictions, where there's any affirmative duty on a proposed insured to do anything other than to be truthful when asked. She was that. And, in fact, let me just recall to you that, remember, the app is signed on the 26th of every Christmas, 2000. The medical exam occurs a few days later, still in the end of the year. It's only in February 17th that she's referred, because what does she have? A cough and back pain. Soft back pain. I just got over a cold. I had a cough and soft back pain for about three days, along with a heck of a lot of other symptoms. That's not enough. She goes to see a doctor. He finds a soft tissue nodality on the right lung, not communicated to her. She takes the X-ray to the pulmonary person, and he gives her a differential diagnosis literally days before, three days before the policy delivery. But differential diagnoses, Justices, are something that, although it's a cute word, it's a guess. It's a medical guess. Bauer v. Royall, I think it's a 1957 case that says, We're not going to, in the insurance setting, hold anyone, any citizen, who's obviously not medically trained, to the knowledge that is greater than the physician himself. If a doctor, perhaps learned in medicine, could not diagnose you on day X with a condition, the law will not supersede its knowledge of that treating physician. That doctor ordered additional testing, and the test results didn't come back until after the policy was delivered, right? Yes, sir. And the point of his diagnosis was, yes, one thing was cancer. One thing was scarring from old infection, and one was pneumonia. But it turned out to be the worst, and she died about a year later. But the point is, he didn't know that day. How could she know? That's where we get back to my point. It's a window of time. We're not going to throw the baby out with the bathwater here. We're not going to open the floodgates to litigation against the insurance companies. We're not going to upset any apple cart of how policies are taken to the market, delivered, or otherwise dealt with. We always have to look so carefully at this one window of time. Because events like this, in the good Lord, with the population that we have out here, it happens. And all they had to do to secure themselves a strong place that could not be attacked was to simply ask that she reaffirm. And if you recall, in my brief, the agent's declaration didn't say that he asked, how you doing? It should have been a formal document, but he didn't. He delivered the policy to her. There was no exchange of information. That was merely the transfer of the policy in exchange for the check. And I would suggest that the agents are trained in any good company. This is a very good company. That the agents are trained that if the insurer on that, we call it the good health of the insurer on the data delivery application, the reaffirmation question that was not followed through here, that if the person was to say, I've just been to the doctor and he gave me actually some concerning news about a little shadow on my lung. That the agent is trained to say, you know what? I'm sorry to hear that, but I cannot deliver the policy to you today. I must wait. And I must go back and we must continue to underwrite it. That's not what happened. So the industry knows how to do it. Just for whatever reason, they want to sell this variable annuity product here. They chose to use different language. And as you saw in my brief, there was also a sale to her four children at the same time, life insurance. And I thought this was, I specialize in this area. I thought this was an odd provision. I'd never seen it. So when I looked, I thought it couldn't be the same as in their kids policy. So I had the kids, it was all the same. That is how they go to market. They want to save some time for rebuttal. Yep. Thank you. If they then make that choice and they themselves leave. So one question under the application, when does the policy become effective upon delivery? Only upon delivery. Your Honor, it would be it would be effective earlier if there was temporary insurance. And the clause right above the one we just read on that page to up talks about temporary insurance. If you had paid a partial premium earlier, you could have it, but it would limit the amount. So it would be the 27th. Yes, sir. Okay. Counsel. Good morning, Your Honor. Vivian Lurti on behalf of Appellee C. John Hancock Entities. As this Court has recognized, Your Honor, there are two grounds here, two separate and distinct grounds here on which to rule that John Hancock is not liable to the appellants under policy number ML7102808. Now, each of these grounds is sufficient to sustain the district court's judgment. The first ground, as you know, is the condition precedent failed because Jane Fong consulted with or was examined by or treated by a physician during the time period between the application and the delivery of the policy. It's clear and explicit. It's right above her signature page. In fact, she signed this application. It's not really very clear, I don't think. It is on the signature page, but it's up. It's not just right before her signature. It's up a couple paragraphs above that, sort of tucked away, it looks like to me. It's got 12 paragraphs right above the place where she signed. Before, where it says provisions F and G apply and provisions H, I, J, K, L apply and so forth. It's up above all of that, tucked away in one paragraph there about the and certainly not in bold, saying that if you go to a doctor and before it's delivered, this policy won't take effect. And like provisions have been interpreted by this court, in fact, in New York Insurance Company versus GIST and various other state and federal courts as being enforceable, as being clear, as having plain language, and they're all similarly written. So unless this court wishes to overturn numerous case laws saying that these types of provisions are enforceable, then I believe that this court has to sustain the district court's decision. So any requirement that it be especially apparent or called to the attention of the proposed insured has really no effect. This is a large application, a lot of pages. What, 19 or something? Right. I understand that, Your Honor. Each goes to different questions in different areas regarding her health, regarding her finances, and various other things, you know, regarding her activities. But this particular one is clearly labeled agreements and signatures. Agreements. This is what she agreed to, these 12 provisions there on this one page where she signed specifically. And let me address, Your Honor. Whether or not Jane Fong believed that she was in good health is irrelevant to this particular provision. And these courts have already distinguished the good health provisions from this particular provision. This is a no interim consultation provision, not a good health provision. And as long as she knew that she had consulted with this physician during this time period, this interim period, then the condition precedent fails. And it is an enforceable provision, and this court must interpret the plain language of this provision. We've had cases in the past in this area of panels that I've sat on where, as Mr. Scott suggests, the carrier has either verbally, through the agent when the policy is delivered, or through a separate writing prior to delivery, basically ask the applicant, are you in the same condition you were 60 days ago when you applied for this policy? And that was not done here, as I understand it. But that argument has been rejected, and it's been made in numerous other cases as well, including one that Judge Hugg wrote the opinion on, Freeman v. Allstate, that the duty to disclose is an affirmative duty upon the applicant. And whether or not the insurer subsequently asks for an update is not relevant to the question. And, in fact, it's not fair to shift that burden and say, I've reached my duty, but, heck, you never asked me, so I don't have to tell you, I can just conceal this stuff, even though it's material to your risk, the material to your decision to enter into this contract. Now, an analogy to that would be, let's say you were offered an employment contract, and you were banking on getting medical coverage because of that employment contract, and you have a family to insure, and you're made an offer, which includes this medical coverage, and you go home and you think about it, and in the interim, the company decides, well, maybe we should just take money out of their salary to pay for the coverage instead of the company paying for it. And you come in, say, maybe two weeks later and say, I'm going to accept your employment offer, but the company never bothers to tell you that, gee, now we're considering maybe taking it out of your salary, you know, the premiums out of your salary. Would that be fair for the company not to tell you that? It's a similar situation. The obligation is affirmative one upon the applicant to say, these things happened in between the time of my application and the completion of the contract. In fact, the case law specifically says that. All of these numerous cases specifically say that. And in California, it's even codified that it is. In fact, it's in my appendix here in my brief. California Insurance Code Sections 330 FSEC specifically say that the obligation is affirmative one upon the applicant to disclose her medical history and changes to her medical history that occurred during the time between the application and delivery of the policy, the completion of the contract. Section 356 provides that the completion of the contract of insurance is a time to which a representation must be presumed to refer. Under the familiar rules governing the formation of contracts, no contract came into existence until it delivered the policy. And accordingly, Jane Fong had an obligation imposed by law, both statutory law and case law, and citing two, Security Life Insurance Company v. Booms and Casey's v. O-Line Insurance Company. But that is a time when her representations must refer to. So anyway, we're asking for her medical history, not her subjective belief regarding her health condition. It really doesn't matter under this particular condition whether or not Jane Fong believed that her health condition had changed, merely that her medical history regarding her consultations with the doctors had changed. And in fact, I think there was a slight misrepresentation, I don't know, maybe it was just a mistake, that I heard from Mr. Scott regarding what it is that Jane Fong knew. There we go. About the lung mass. In the cross-complaint, and I'm referring to ER page 15, they admit that Jane Fong was informed that she has a soft tissue nodularity in her right lung that required additional testing. She was well aware that there was an abnormality in her lung. She was also well aware that she required additional testing. And in her application, when we were asked if there was additional testing that wasn't completed, she answered no. She was obligated at that point to voluntarily amend her answer and say, yes, I've been told I needed additional testing and I was told I had this, you know, abnormality in my lung. And worse yet, back in 1999, she submitted a different, a previous application to John Hancock. At that time, there was a finding of an abnormality in her ovary. And, you know, same thing, a mass that showed up on some scan or x-ray. And John Hancock said, no, based upon this, we can't insure you at this time. Why don't you complete your treatment, complete your diagnosis, and then, you know, we'll make a decision as to whether or not we want to insure your life. So, you know, that goes to show both the materiality of this kind of finding and also goes to show that Jane Fong should have known that it was material to John Hancock and therefore her failure to disclose it, whether it's, you know, a mistake or something she simply forgot, is still grounds for rescission. That goes to the second prong. And I'm sorry, I'm kind of confusing it because of the questions that are being asked. The first prong is the condition precedent. The second prong goes to disclosure of material facts. As to that second prong in the duty to disclose on the part of the insured or the prospective insured, does that exist independently? Yes. It exists because of the request? Absolutely. It exists because of case law imposing that duty. It exists because of California statutory law imposing that duty. Is there any application? In the application are questions regarding whether or not you've been asked to go through additional testing. In the application are questions regarding whether or not there are any indications of cancer, not that you've been specifically diagnosed with cancer. So I would think that a differential diagnosis of a risk of cancer would fall well within that. Well, at the time she signed that, was she in error then? At the time she signed it, she was not in error. But as I stated, she had a continuing duty to disclose. And that's clear in the case law and the statute. Well, it may be clear from the case law, but is it clear from the application that she signed and from the fact that there be some sort of request on her part to do that? There is. But she had a continuing obligation to disclose. Where does it say that? It's imposed upon her by the case law and by the statute. So she has to go out and read all the case law before she can enter into a contract with the insurance company? No. But that's where I was mentioning the 1999 application, that she, at that point, was well aware that this was a material fact. And for common good faith, she should be able to say. But you see what my problem is this, that if there's nothing that says in the contract, the application contract, that she has a continuing duty to explain anything that has changed with regard to her health, if that's in the application agreement, that's fine. But I don't see that there. But this goes beyond the express provisions of the contract and goes into what is a good faith duty and what should people to a contract be obliged to do for each other. So when someone comes up to deliver the policy to me, I've got to think, oh, my gosh, let's see. I've had some health problems that I better tell you about. That's what she has to do? Yes. Yeah, but nothing says that in the application to warn her of that. Other than the condition precedent and other than all of the questions that she was asked regarding her health and her application, those would be the ones which would warn her about her need to disclose. The term good health provision is a term of art, is it not? It is. And it goes to those provisions which ask expressly about whether or not the applicant is in good health or continuous insurability and is readily distinguishable. Can you point me to the good health provision in the application? There is no good health provision in the application. This is distinguishable from the good health provision. It is a no interim consultation provision. And that is paragraph D that we've been discussing so far. I notice I'm running a bit low on time, and I wanted to get to a couple of things that were raised. And Judge Hugg in Freeman, in fact, said in that material, albeit innocent in the statements, are grounds for rescission, that the insurer has the right to know all that the applicant knows about her medical history. At what point? At the point of the At what point? At the point that the contract is accepted, point of delivery and payment. And, in fact, in Life Insurance Company v. Katz, this Court rejected the argument that because the applicant believed that her health problems were insubstantial, she was justified in not revealing this prior treatment. John Hancock can't be shipped at the burden of saying, oh, now you're at fault, because you didn't specifically ask when, in fact, you had an affirmative duty to disclose material information, whether or not John Hancock specifically asked for it. Judge Thompson in Cigna v. Polaris applied the doctrine of, I'm sorry, my Latin is horrible, basically, good faith doctrine. And the United States Supreme Court applied the same doctrine in Stippich v. Metropolitan Life-to-Life Insurance Policy. And that doctrine says that the applicant must, even if not asked, review every fact within her knowledge which is material to the risk. Failure to do so makes the contract voidable by the insurance company. And this rule applies with added force to changes affecting the risk, which comes to the knowledge of the applicant between the time of the application and the delivery of the policy. So I think that this Court should be bound by this Stippich case to rule in favor of John Hancock. And Judge Hopkins in K.F. Daris says that in questions of insurance contract, the Court's initial focus must be upon the language of the policy itself, not upon general rules of coverage, which are not responsive to the policy language, so that looking to the condition precedent, which says clearly, you know, if you consult with a physician during this interim period, the contract does not take effect. Has that been construed by the California Supreme Court? It has not, but it has been construed by this Court in gist. Did you shepherdize Kiyosara? Because we all have banging around in our heads the cases in which the United States Supreme Court has seen fit to reverse this, and I have the sort of the vague memory that that's on my list. I could be wrong. I'll check. Okay? Well, thank you, Your Honors. Thank you. I know our questions have bounced you around a bit, but we appreciate your argument. Anything else you'd like to add? Yeah. Just a couple of things that Mr. Scott raised. Sure. This is not an exclusion. It's a condition precedent. And the very fact that she was in their own pleadings, that she was told about this, and also Dr. Woo testified in his deposition that he told her about the abnormal mass, and that this is material to John Hancock's decision whether or not to insure her. And under those circumstances, she is obligated to disclose it. And in fact, being told of a differential diagnosis, which includes the risk of cancer, it would certainly be a strange set of facts to say that a life insurance company would not be concerned about the risk of cancer. In fact, insurance is about risk. I have no problem with this being an intervening treatment provision. I have a hard time seeing how it is a good health provision because there is not. It is not. That's exactly my point. It is thoroughly distinguishable, and it is the appellants who want to fit it into being a good health provision. But it is certainly not. All she needed to know was that she consulted with the physician. And then she did not need to know, unlike the good health provision, she did not need to know that the condition of her health had changed. So I'm just really trying to distinguish it. And if I'm not making myself clear, I apologize. But they are two separate distinguishable provisions. Okay. Thank you for your argument. Thank you, Your Honor. I'll try to be brief. Let me just cover that Dr. Lan in the same exhibit on volume one that we all looked at. Remember, we were looking at our one page, one specific page is 94. On to 220, the doctor is asked, and I'll just read the answer, about what do you mean by differential diagnosis? His answer on line 20, I'm sorry, on page 220 at line four, answer, because with limited information and limited contact and examination of patient, you know, just the first time, we can formulate a list of different conditions. But we're not too sure. So we have to push it further. We have to get more testing just to confirm the diagnosis. And he goes on, just one more quote at 222, at line 18 he says, in that same context, because like I mentioned earlier, I cannot come up with a firm diagnosis just based on the limited examination and limited information. So I need more information, more testing. That was the state of his knowledge three days before the policy was delivered. We cannot visit on her any knowledge beyond that. He didn't know. She didn't know. The question comes down, and counsel wants to mix this up here by using the word materiality. Materiality, and it's found, I think the best place for it is in Thompson versus Occidental, our California Supreme Court case on misrepresentation in this exact setting in life insurance. In Thompson, it was a Dr. Thompson, by the way. He had varicose veins. He had a bad heart. He had a lot of things wrong with him. But he did not appreciate the significance of those things on an application, straight application. Question answered, one, two, three, a physician. The court said in that context, one, which is important to our discussion here, it can be material if the company deems it by asking the question. Here, justices, there was no question. The time she answered the health questions on December 30th in front of their physician of their choosing, when she presented herself, she answered everything truthfully. There was and can be no misrepresentation here. The visitation clause didn't require, doesn't require any knowledge of severity or conclusion, or it just, if you visit a doctor. It's a conduct statute, if you would, a conduct provision. That's right. Yes. And my point to you back is, I understand that, that that then tries to in some way impose a duty to disclose, a duty to disclose that conduct. It doesn't say anything about disclosing it. And that's my, and my point is, it's not in the, it's not in the policy. It's not listed as an exclusion. It's not plain and conspicuous. And it doesn't. It's in the application, the agreement. Yes, sir. It's in the application, but not in the policy of insurance. Well, we don't, what we're talking about is whether the policy ever takes effect or not. Yes. And it did take effect because it was delivered and payment was received and held and she lived on for another year before the claim was made. So the policy was in effect for that time. They wanted to try to come back and undo that in a way that offends all California law. There's no California case that says they can do this. And specifically, there is California cases that say you can only rescind based on a material misrepresentation. And justices have visited this subject. This clause says it doesn't even ever take effect. It says it takes effect when delivered, but only if it's time of delivery and they haven't seen a doctor and so forth. So it never took effect. And respectfully, Your Honor, they tried to construe that as a condition precedent. And in California law, we do not have condition precedents. We have representations. And there has to be a representation to avoid the contract. They cannot get away with this window of time by shifting that burden to the insured to remember and to volunteer. There's no case, no statute, and there's no case law that says this. I know the case law in California. There is no case law and there's no statute that says that the insured must voluntarily do it. There's no statute that says that in insurance law. We've been through all these cases before. This is a provision that specifically requires somewhat the duty to be shifted in a way that operates as an exclusion and, therefore, it violates reasonable expectation of the insured and it is not plain, clear, and conspicuous as every exclusion must be. It has to fall within there. Thank you very much. Roberts. Roberts. Thank both sides for their argument. The case just argued will be submitted for decision and the court will stand in recess for the day.
judges: Hug, Thompson, Hawkins